*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2025 UT 2**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

MORRIS THOMAS MULLINS,
*Appellant.*

No. 20200149
Heard October 18, 2023
Filed March 13, 2025

On Direct Appeal

Sixth District Court, Sevier County
The Honorable Marvin D. Bagley
No. 011600140

Attorneys:

Derek Brown, Att'y Gen., Jeffrey D. Mann, Asst. Solic. Gen.,
Salt Lake City, for appellee

Scott Keith Wilson, Benjamin C. McMurray,
Salt Lake City, for appellant

CHIEF JUSTICE DURRANT authored the opinion of the Court, in
which ASSOCIATE CHIEF JUSTICE PEARCE and
JUSTICE PETERSEN joined.

JUSTICE HAGEN authored an opinion concurring in part and
dissenting in part, in which JUSTICE POHLMAN joined.

CHIEF JUSTICE DURRANT, opinion of the Court:

### INTRODUCTION

¶1    Morris Mullins pled guilty to aggravated murder and was
sentenced to life without parole (LWOP). Because he was seventeen
years old when he committed the crime, this is a juvenile life

without parole (JLWOP) sentence. Now, at age forty and having already spent more than two decades in prison, Mullins challenges his sentence as unconstitutional. He brings seven state and federal constitutional challenges, among them that his sentence was cruel and unusual in violation of the Eighth Amendment to the United States Constitution and article I, section 9 of the Utah Constitution.

¶2 We do not reach three of Mullins's claims because they were not properly brought under rule 22(e) of the Utah Rules of Criminal Procedure. Of the claims we do reach, we conclude that Mullins succeeds on only one. After Mullins was sentenced, the United States Supreme Court decided a series of cases concluding that it is unconstitutional to sentence juvenile offenders who are not permanently incorrigible to JLWOP. Here, we conclude that the record contains ambiguity that undermines our confidence that this standard was met. Accordingly, we vacate Mullins's sentence and remand his case to the district court for resentencing.

## BACKGROUND

¶3 In May 2001, Mullins killed a seventy-eight-year-old widow, Amy Davis, in her home. Mullins was seventeen at the time. The State charged him as an adult with rape and aggravated murder. Mullins pled guilty to aggravated murder in exchange for the State dropping the rape charge and taking the death penalty off the table.

¶4 At sentencing, the parties presented dueling evidence about whether Mullins should receive JLWOP or life with the possibility of parole. The prosecution focused on the heinousness of Mullins's crime and on his actions and statements in jail that indicated a continuing desire to inflict violence on women for pleasure. Several of the victim's family members testified about the impact of the killing, asking the court to impose JLWOP.

¶5 The defense presented mitigating evidence, largely based on a psychological evaluation conducted by a clinical and forensic psychologist. Defense counsel remarked that Mullins had "the most profoundly dysfunctional upbringing and rearing and family life that . . . members of the defense team ha[d] ever seen, and that says a lot." He stated that Mullins's removal from that dysfunctional environment gave him "some hope that Mr. Mullins c[ould] turn things around." Counsel also stated that Mullins had been discouraged from interacting with anyone outside his small and dysfunctional community, had an IQ well below average, suffered physical abuse by his parents, witnessed severe alcohol

abuse by his parents, struggled with impulsivity, and was taught and rewarded for antisocial behavior as a child.

¶6 At the end of the hearing, the district court sentenced Mullins from the bench to JLWOP. The judge stated that he had read the submitted reports, heard the family members' statements, and listened to counsel's arguments. The judge recognized that Mullins's life had been "chaotic" so far, but, upon balancing "the family's requests and Mr. Mullins'[s] request and the need to send a message," the judge determined that JLWOP was the requisite punishment. The judge concluded the hearing by addressing Mullins directly, stating: "[I]f you're gonna be with us for a long time and have a chance to change, I hope—not under the present circumstances—I'm hoping you'll find some way to be productive."

¶7 More than a decade later, in April 2013, Mullins filed a pro se motion to correct an illegal sentence under rule 22(e) of the Utah Rules of Criminal Procedure in the district court. He based his challenge on "new law" created in *Miller v. Alabama*, in which the United States Supreme Court held that mandatory JLWOP violated the Eighth Amendment because it did not allow a sentencing judge to consider the juvenile's "lessened culpability and greater capacity for change."[1] Mullins's petition asserted that (1) his JLWOP sentence was unconstitutional because there was "no record indicating that the court took into consideration [his] youth"; and (2) because it was unconstitutional to sentence him to the death penalty, it was also unconstitutional for the State to offer to take the death penalty off the table "in exchange for [him] pleading guilty to aggravated murder." Mullins also generally discussed *Miller* and the line of cases leading to that decision.[2]

¶8 The district court appointed counsel to argue Mullins's 22(e) motion. The State stipulated to the appointment, so long as counsel did not "change the issue in dispute or expand the scope of the litigation." At the motion hearing, Mullins's counsel relied on Mullins's original petition to argue that the court did not appropriately consider Mullins's youth as required by *Miller*. He

---

[1] 567 U.S. 460, 465 (2012) (cleaned up); *see also Tison v. Arizona*, 481 U.S. 137, 156 (1987) ("[T]he more purposeful is the criminal conduct, the more serious is the offense . . . .").

[2] *See Graham v. Florida*, 560 U.S. 48 (2010); *Roper v. Simmons*, 543 U.S. 551 (2005); *Miller*, 567 U.S. 460.

also argued that the court should have made specific findings as to Mullins's incorrigibility. The State countered that Mullins "may [have been] a juvenile at the time he committed the crime, but the process was followed and he was a juvenile who was in adult court and he was treated like an adult." Regardless, the State argued, the sentencing scheme was discretionary, so *Miller* did not apply.

¶9   In November 2016, the district court denied Mullins's motion. It characterized his claims as follows: (1) JLWOP is categorically unconstitutional, and (2) a sentencing court must justify its sentence with findings on the record. The court then rejected both arguments based on *Miller* and *State v. Houston*.[3] Under the Utah Rules of Appellate Procedure, Mullins had thirty days to file a direct appeal.

¶10   In May 2018, well after the thirty-day cutoff period, new counsel for Mullins petitioned the district court to reinstate the time to appeal the denial of his 22(e) motion. Mullins asserted that his previous appointed counsel had been constitutionally ineffective. Specifically, he stated that his previous attorney told him that he would appeal if the court denied his 22(e) motion. But when the district court denied the motion, previous counsel did not appeal or tell Mullins of the denial, which, Mullins argued, led to his untimely appeal. The State stipulated to the motion to reinstate the time to appeal, and the district court granted it. In February 2020, Mullins appealed the denial of his 22(e) motion. We retained the case to hear the appeal directly.

**STANDARD OF REVIEW**

¶11   Mullins brings his challenges under rule 22(e) of the Utah Rules of Criminal Procedure, which governs challenges to illegal sentences. We review district court decisions on challenges to illegal sentences "for correctness and grant[] no deference to the district court."[4]

¶12   Mullins also raises some challenges to his sentence that he did not raise before the district court. We treat those claims as new 22(e) claims and reach them for the first time in this appeal.[5]

---

[3] *See Miller*, 567 U.S. 460; *State v. Houston*, 2015 UT 40, ¶¶ 32, 52–63, 353 P.3d 55.

[4] *State v. Houston*, 2015 UT 40, ¶ 16, 353 P.3d 55.

[5] *See infra* ¶¶ 39, 46, 51, 55.

## ANALYSIS

¶13  Mullins raises seven claims on appeal, arguing that (1) the sentencing court violated the Sixth Amendment to the United States Constitution when it increased the minimum sentence based on judicial factfinding; (2) the sentencing statute was unconstitutionally vague; (3) imposing a JLWOP sentence on an intellectually impaired juvenile violates the Eighth Amendment to the United States Constitution; (4) imposing JLWOP on an intellectually impaired juvenile violates article I, section 9 of the Utah Constitution; (5) JLWOP sentences are categorically unconstitutional under article I, section 9 of the Utah Constitution; (6) JLWOP sentences are categorically unconstitutional under the Eighth Amendment to the United States Constitution; and (7) a JLWOP sentence was unconstitutional under the Eighth Amendment as applied to his case.

¶14  As a threshold issue, we must determine whether the legal vehicle Mullins uses to challenge his sentence, rule 22(e) of the Utah Rules of Criminal Procedure, allows us to reach the merits of his claims. As explained below, amendments to rule 22(e) during the pendency of the current litigation complicate that analysis. We begin by discussing how each version of rule 22(e) operates. We then analyze Mullins's claims under the appropriate version of the rule and ultimately vacate Mullins's JLWOP sentence based on his as-applied Eighth Amendment claim.

I.  ANALYSIS UNDER RULE 22(e) OF THE UTAH RULES OF CRIMINAL PROCEDURE

¶15  Mullins brings his claims under rule 22(e) of the Utah Rules of Criminal Procedure. This subparagraph of rule 22 governs when a court must correct a convicted criminal defendant's sentence. In 2019, we changed the rule's language significantly. Because the two versions of the rule operate differently, the first step in our 22(e) analysis asks which version of the rule applies to each of Mullins's seven claims—some brought in his original motion and others brought for the first time on appeal. We outline the framework for making this determination first. We then identify the requirements for bringing a challenge under each version of the rule.

### A. We Evaluate Each Claim Based on the Version of Rule 22(e) in Effect When The Claim Was First Raised

¶16  Mullins filed his original 22(e) motion in 2013 under the rule as it existed at that time (old rule).[6] But he did not appeal the district court's denial of that motion until 2020, after changes to the rule had taken effect (new rule).[7] He argues that because he filed his original 22(e) motion before the rule changed, all claims—even those the State argues were raised for the first time on appeal, after the amendment took effect—should be subject to the old rule.

¶17  The State sees this issue differently. It argues that all of Mullins's claims should be subject to the new rule. According to the State's logic, because none of Mullins's claims on appeal were included in his original motion, we should treat his appeal as the equivalent of a new 22(e) motion and apply the new rule to all his claims on appeal.

¶18  The law governing appellate review of a legal event is "the law as it exists at the time of the event regulated by the law in question."[8] This "analysis may be applied to either statutes or rules."[9] Thus when determining which version of a rule applies, the relevant questions are "what 'event' is being regulated by the [rule] in question and, further, when that event occurred."[10] The State and Mullins disagree about what the regulated event is. Mullins believes the regulated event is filing a 22(e) motion. In other words, Mullins argues that because he filed his original motion when the old rule was in effect, that rule should govern all claims before us now, even claims not raised below. The State believes that the regulated event is raising a 22(e) claim. So the State contends that any claims not presented in the original rule 22(e) motion should be governed by the new rule. We agree with the State.

---

[6] *See* UTAH R. CRIM. P. 22(e) (2013).

[7] *See id.* (2020). Because the rule has not been amended since Mullins filed his appeal in 2020, we refer to the current version throughout our analysis. *See id.* (2025).

[8] *State v. Clark*, 2011 UT 23, ¶ 13, 251 P.3d 829.

[9] *Beaver Cnty. v. Utah State Tax Comm'n*, 2010 UT 50, ¶ 10 n.5, 254 P.3d 158.

[10] *O'Connor v. Labor Comm'n*, 2020 UT App 49, ¶ 11, 463 P.3d 85.

¶19 When a law or rule regulates a substantive right, the relevant event is the parties' "underlying primary conduct."[11] When the relevant law regulates procedure, the relevant event is the "underlying procedural act."[12] Both parties assume that rule 22(e) is procedural, and, without deciding the issue, we follow their lead. Because we assume rule 22(e) is procedural, the "regulated event" is the underlying procedural act that the rule governs.

¶20 At first blush, the relevant procedural event appears to be the filing of a 22(e) motion, as Mullins suggests. But under both versions of the rule, a defendant may sometimes bring a challenge for the first time on appeal.[13] This means that Mullins's interpretation fails because not all rule 22(e) challenges will stem from a 22(e) motion. The relevant "regulated event," then, is raising the individual claim that challenges a sentence, as the State argues.

¶21 As applied to this case, this means that any claims brought in Mullins's original motion—before the rule was amended—are governed by the old rule. Any claims brought for the first time on appeal—after the rule was amended—are governed by the new rule. Mullins filed his original motion pro se in 2013. The district court then appointed him counsel for argument. But the court limited the scope of the arguments appointed counsel could make to only those contained in Mullins's original motion. We thus look to both Mullins's pro se motion and his counsel's arguments at the motion hearing to understand which claims Mullins brought in his original motion and which claims are therefore governed by the old rule.

---

[11] *Jones v. Mackey Price Thompson & Ostler*, 2020 UT 25, ¶ 49, 469 P.3d 879 (cleaned up).

[12] *Id.* (cleaned up).

[13] *See State v. Houston*, 2015 UT 40, ¶ 20, 353 P.3d 55 (holding that under the old rule, an appellate court may vacate an illegal sentence based on an argument raised for the first time on appeal); *see also infra* ¶¶ 29–31, 36 (explaining that under the new rule, a defendant may raise an unpreserved challenge to a sentence on appeal if a preservation exception applies).

*B. The Old Rule and the New Rule Impose Distinct Requirements*

¶22   Having established that we apply the version of rule 22(e) in effect when the defendant first raised each claim, we now explain the requirements of the old rule and the new rule.

¶23   The old rule provided: "The court may correct an illegal sentence, or a sentence imposed in an illegal manner, at any time."[14] Generally, we will not hear an argument that an appellant did not first raise before the district court.[15] But, because of the "sweeping language" of the old rule,[16] we have held that the typical "preservation rules do not apply in the context of [an old rule] challenge."[17] So we may still hear a challenge brought under the old rule "even if the issue is raised for the first time on appeal."[18]

¶24 Despite falling within an exception to our traditional preservation rules, claims brought under the old rule must still satisfy another requirement. Out of concerns about abuse and in pursuit of judicial economy, we narrowed the scope and type of claims that could be brought under the old rule by requiring a 22(e) challenge to be "facial."[19] We defined "facial" in *State v. Houston* to mean that the challenge must seek to correct a defect in the sentence

---

[14] UTAH R. CRIM. P. 22(e) (2013). We held in *State v. Candedo* that the old rule "is sufficiently broad" to permit challenges based on "constitutional violations that threaten the validity of the sentence." 2010 UT 32, ¶ 14, 232 P.3d 1008, *superseded by rule on other grounds as stated in State v. Robinson*, 2023 UT 25, ¶¶ 17–18, 540 P.3d 614. "[I]f an offender's sentence is unconstitutional, the sentence is not authorized by the judgment of conviction, and is therefore illegal." *Id.* ¶ 13 (cleaned up). This court may reach the merits of a constitutional challenge under the old rule so long as the defendant "raises an articulable basis for challenging the constitutionality of [the] sentence," *id.* ¶ 14, and the claim satisfies the reviewability requirement, discussed below, *see infra* ¶¶ 24–27.

[15] *State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443.

[16] *Candedo*, 2010 UT 32, ¶ 9 (cleaned up).

[17] *Houston*, 2015 UT 40, ¶ 20.

[18] *State v. Brooks*, 908 P.2d 856, 860 (Utah 1995).

[19] *See State v. Prion*, 2012 UT 15, ¶¶ 20–22, 274 P.3d 919; *Houston*, 2015 UT 40, ¶ 27.

in a way that does not require further factual development in the district court.[20] This requirement served two purposes. First, it worked to keep out "fact-intensive challenge[s] to the legality of a sentencing proceeding asserted long after the time for raising [such challenges] in the initial trial or direct appeal" had expired.[21] Second, it allowed us to consider only claims that we could decide based on the record and arguments before us, thus avoiding the lengthy and inefficient process of remanding a case to district court for factfinding.[22]

¶25 Though we used the terms "facial" and "as-applied" in *Houston*, a close inspection of our caselaw shows that in this context, the terms vary from their traditional meaning.[23] Under the traditional definition, a facial challenge asserts that a statute "always operates unconstitutionally."[24] In contrast, "as-applied" traditionally means a challenge to a statute only in "application to a particular party."[25] In *Houston*, we used the terms "facial" and "as-applied" to merely illustrate the difference between the types of analyses we intended to include in and exclude from the scope of the old rule. More precisely, the old rule excludes claims that would require us to remand a case for further factual development or to resolve factual disputes.[26] Instead, under the old rule, we may consider only claims that raise "purely legal question[s]" in which the "pertinent facts are undisputed."[27]

¶26 Ultimately, the old rule allows review only of defects that "could easily be corrected without the need for factual development in the original trial court."[28] We acknowledge that the use of the terms "facial" and "as-applied" in this slightly different

---

[20] 2015 UT 40, ¶¶ 26–27; *see also Prion*, 2012 UT 15, ¶ 22.

[21] *Houston*, 2015 UT 40, ¶ 23 (cleaned up).

[22] *See id.* ¶ 27.

[23] *See id.* ¶ 26–27.

[24] *Archuleta v. State*, 2020 UT 62, ¶ 35 n.3, 472 P.3d 950 (cleaned up).

[25] *Id.* (cleaned up).

[26] *See Houston*, 2015 UT 40, ¶ 27.

[27] *Id.* (cleaned up).

[28] *Id.* ¶ 24 (cleaned up).

context invites confusion. For clarity, in interpreting claims under the old rule, we will recharacterize the requirement as one of "reviewability": the old rule bars challenges that require further factual development or factfinding while permitting challenges that are legal or resolvable based on the existing record.

¶27 Under this definition, some claims that qualify as "as-applied" in the traditional sense will require further development of the record for us to make an informed decision; the old rule excludes those fact-intensive claims. But other claims that would traditionally be defined as "as-applied" will require no further factual development and may be resolved by us on the undisputed facts in the record; the old rule permits us to hear those claims.[29]

¶28 Having established the requirements of the old rule, we turn to the new rule. We hold that the two key features of the old rule—the preservation exception and the reviewability requirement—do not carry over to the new rule for several reasons.

¶29 First, we address preservation. The old rule was silent on how a defendant could request the correction of an illegal sentence. It provided only that a court could correct an illegal sentence "at any time."[30] But subparagraph (e)(3) of the new rule imposes new

---

[29] *Houston* at first appears to support using the traditional definition of "facial" and "as-applied." *See* 2015 UT 40, ¶ 26. There, we implied that all as-applied challenges are, in fact, challenges to the "underlying conviction that rule 22(e) does not allow. *See id.* We looked to *State v. Telford*, suggesting that in *Telford* we rejected an as-applied claim solely because it was as-applied. *See id.* (citing *State v. Telford*, 2002 UT 51, ¶ 7, 48 P.3d 228 (per curiam), *superseded by rule as stated in Robinson*, 2023 UT 25, ¶¶ 19, 23)). But upon a careful reading of *Telford*, it becomes apparent that we did not hold in that case that all as-applied challenges attack the underlying conviction. Instead, we based our rejection of the as-applied claim in *Telford* solely on the ground that the claim challenged the underlying conviction, not the sentence. *See* 2002 UT 51, ¶ 7. This type of challenge is independently prohibited by the old rule. *See id.*; UTAH R. CRIM. P. 22(e) (2013). So *Telford* does not illuminate the contours of the reviewability requirement. And a better reading of our caselaw as a whole supports the reviewability requirement as articulated in this opinion.

[30] UTAH R. CRIM. P. 22(e) (2013).

procedural requirements for bringing a 22(e) challenge.[31] It states that "[a] *motion* under" several provisions of the rule "must be filed no later than one year from the date the facts supporting the claim could have been discovered"; under other provisions a motion "may be filed at any time."[32] Whereas the old rule made no mention of a motion,[33] the new rule dictates that claims be brought by motion.[34] Because rule 22(e) is found in the Utah Rules of Criminal Procedure—the rules governing "criminal proceedings" in most non-appellate courts of this state—we read subparagraph (e)(3) to govern motions filed with the district court.[35] The new rule thus provides that a defendant may bring a 22(e) challenge by filing a motion with the district court within the given time parameters.

¶30   With the new rule requirement that a defendant first file a 22(e) motion with the district court, we find it appropriate to apply our traditional preservation rules on appeal. Those traditional preservation rules include several exceptions that, in limited circumstances, allow a defendant to bring challenges directly to an appellate court.[36] In sum, under the new rule, if a defendant seeks to raise on appeal a challenge to his sentence that he did not raise in his 22(e) motion before the district court, we will hear the unpreserved issue only if the defendant can show that an exception to preservation applies.

¶31   We pause to recognize that when Mullins appealed the denial of his 22(e) motion, we had not yet established that a 22(e) challenge under the new rule brought for the first time on appeal would be subject to our preservation requirements. Because of the unique circumstances of Mullins's case, we will not require him to show an exception to preservation for us to hear his claims under the new rule. Our inquiry into which version of rule 22(e) applies to each of Mullins's claims largely mirrors a preservation inquiry.

---

[31] *Id.* R. 22(e)(3) (2025).

[32] *Id.* (emphasis added).

[33] *See id.* R. 22(e) (2013).

[34] *Id.* R. 22(e)(3) (2025).

[35] *See id.* R. 1(b), (c).

[36] *See generally State v. Flora*, 2020 UT 2, ¶ 9, 459 P.3d 975 ("This court has recognized three distinct exceptions to preservation: plain error, ineffective assistance of counsel, and exceptional circumstances." (cleaned up)).

As a result, once we have determined that the new rule applies to any of his claims, we will not require Mullins to separately show that a preservation exception also applies. But because this court does not typically find facts,[37] in Mullins's case we will reach only claims that we can resolve on the record before us. And we put future defendants who challenge their sentences as illegal on notice that they will need to show a preservation exception applies for any new 22(e) challenges brought for the first time on appeal.

¶32 Next, we consider whether the reviewability requirement from the old rule applies under the new rule—and conclude that it does not. Under the old rule, a defendant needed only to show that a claim was reviewable to establish that it was cognizable. But the new rule imposes several textual requirements that the old rule did not. As relevant here, the new rule requires that a motion relying upon new caselaw must be based on a new rule established by a binding appellate court.[38] The defendant must also show that the binding new rule was not "dictated by precedent existing at the time the defendant's conviction or sentence became final."[39]

¶33 We imposed the reviewability requirement under the old rule to prevent abuse and to promote judicial economy. But because the language of the new rule places different requirements on defendants in district court, we no longer need to impose this additional hurdle on appeal, for the reasons we explain below.

¶34 In contrast with the broad language of the old rule, the new rule defines what constitutes an illegal sentence. Subparagraph (e)(1) identifies "six specific categories of sentences that require correction," and subparagraph (e)(2) authorizes correction of an illegal sentence "only if the alleged constitutional violation is grounded in a rule or ruling that was established or

---

[37] *See Carpenter v. Riverton City*, 2004 UT 68, ¶ 4, 103 P.3d 127 (per curiam) ("Because this court does not conduct evidentiary hearings . . . , it simply is not in a position to arrive at a legal ruling that is dependent on the resolution of disputed facts.").

[38] UTAH R. CRIM. P. 22(e)(2) (2025).

[39] *Id.* Because the State does not challenge any precedent on which Mullins relies based on the new rule's second factor, we assume for this opinion that if Mullins shows that a rule or ruling was established after he was sentenced, it was not dictated by precedent that existed at the time his sentence became final.

issued after the defendant's 'sentence became final.'"[40] Because of this new language, the rule "shrank in scope," limiting the categories of sentences that a court could correct.[41] As a result, it is more difficult to engage in the type of abuse that raised concerns under the old rule.

¶35 Further, the new rule promotes judicial economy by requiring defendants to bring their 22(e) challenge before the district court in the first instance. There, the district court will be able to determine the relevant facts before we are asked to review the challenge on appeal. And if a defendant brings an unpreserved 22(e) challenge before us for the first time on appeal, that defendant must invoke an exception to preservation.[42] This preservation requirement serves the same judicial-economy purpose as the reviewability requirement, so we hold that defendants need not separately show that their challenge is purely legal or resolvable on the record.

¶36 In sum, based on the text of the rules, the requirements of the old and new rules are different. Under the old rule, traditional preservation rules did not apply to 22(e) challenges and defendants could not bring fact-intensive claims incapable of resolution on the record. Under the new rule, however, a defendant must file a 22(e) motion with the district court within the time constraints outlined in the rule. Because the rule requires defendants to file in the district court, traditional preservation rules apply to unpreserved 22(e) challenges on appeal. Thus, defendants raising a claim on appeal for the first time must show that an exception to preservation applies. We now apply this framework to each of Mullins's claims.

II. MULLINS'S SEVEN CLAIMS

¶37 Mullins raises seven claims on appeal: (1) the sentencing court violated the Sixth Amendment to the United States Constitution when it increased the minimum sentence based on judicial factfinding; (2) the sentencing statute is unconstitutionally vague; (3) imposing a JLWOP sentence on an intellectually impaired juvenile violates the Eighth Amendment to the United

---

[40] *Robinson*, 2023 UT 25, ¶ 23 (quoting UTAH R. CRIM. P. 22(e)(2) (2019)).

[41] *Id.* ¶ 22.

[42] *See supra* ¶¶ 29–31.

States Constitution; (4) imposing JLWOP on an intellectually impaired juvenile violates article I, section 9 of the Utah Constitution; (5) JLWOP sentences are categorically unconstitutional under article I, section 9 of the Utah Constitution; (6) JLWOP sentences are categorically unconstitutional under the Eighth Amendment to the United States Constitution; and (7) a JLWOP sentence was unconstitutional under the Eighth Amendment as applied to Mullins's case. We reject Mullins's first six claims. But we conclude that the judge's statements on the record here undermine our confidence that Mullins's sentence was constitutional. We thus vacate Mullins's sentence based on his seventh claim and remand for resentencing in the district court.

*A. The Sentencing Judge Did Not Violate the Sixth Amendment*

¶38 On appeal, Mullins argues that his JLWOP sentence violates the Sixth Amendment. He asserts that the sentencing statute required the sentencing judge to engage in unconstitutional factfinding about whether JLWOP is "appropriate" rather than requiring that a jury unanimously find the sentence "appropriate" beyond a reasonable doubt.[43]

¶39 We first ask which rule applies to this claim. In his original motion, Mullins challenged the constitutionality of his sentence only under the Eighth Amendment. He never mentioned the Sixth Amendment. So the new rule applies to this claim. The State concedes that this claim meets all the requirements of the new rule and does not require further factual development.[44] Accordingly, we proceed to the merits of the claim.

---

[43] *See* UTAH CODE § 76-3-207(4)(c) (2001). The sentencing statute has since been amended several times and re-numbered; the relevant provision as modified is now housed in subsection (5). *See id.* § 76-3-207(5)(c) (2025). We refer throughout this opinion to the 2001 version unless otherwise noted. *See State v. Clark*, 2011 UT 23, ¶ 13, 251 P.3d 829 ("[W]e apply the law as it exists at the time of the event regulated by the law in question.").

[44] As we noted above, because we announce for the first time today that our traditional preservation rules apply under the new rule, we do not require Mullins to prove a preservation exception exists for us to hear his claims under the new rule. *Supra* ¶ 31. Out of concerns about judicial economy and judicial competence,

(continued . . .)

¶40   The Sixth Amendment to the United States Constitution guarantees individuals accused of a crime the right to a trial "by an impartial jury."[45] Taken "in conjunction with the Due Process Clause," this right "requires that each element of a crime be proved to the jury beyond a reasonable doubt."[46] "The touchstone for determining whether a fact must be found by a jury beyond a reasonable doubt is whether the fact constitutes an element or ingredient of the charged offense."[47]

¶41   In *Apprendi v. New Jersey*, the United States Supreme Court established that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum" is an element of the crime that "must be submitted to a jury."[48] Then, in *Alleyne v. United States*, the Court extended this rule to facts that increase a mandatory minimum penalty.[49] But these cases "do[] not mean that any fact that influences judicial discretion must be found by a jury."[50] Nor do they mean that juries must find the facts "used to guide judicial discretion in selecting a punishment within limits fixed by law."[51]

¶42   At the time of Mullins's sentencing, Utah Code subsection 76-3-207(4)(c) read, in relevant part: "The penalty of life in prison without parole shall only be imposed if the [sentencing judge] determines that the sentence of life in prison without parole is

---

however, we limit our review in Mullins's case only to claims reviewable without further factual development. *Supra* ¶ 31. We emphasize, however, that the judicially imposed reviewability requirement applied to claims under the old rule does not apply to future claims brought under the new rule. *See supra* ¶ 33.

[45] U.S. CONST. amend. VI.

[46] *Alleyne v. United States*, 570 U.S. 99, 104 (2013) (plurality opinion); *see also United States v. Gaudin*, 515 U.S. 506, 510 (1995).

[47] *Alleyne*, 570 U.S. at 107 (plurality opinion) (cleaned up).

[48] 530 U.S. 466, 490 (2000).

[49] 570 U.S. at 103, 111–12.

[50] *See id.* at 116.

[51] *Id.* at 113 n.2 (cleaned up).

appropriate."[52] Mullins argues that, because the sentencing court "has discretion to impose LWOP only if it first" finds that "LWOP is appropriate," the court must make a factual finding beyond those facts admitted in a plea bargain. He contends that "LWOP can be imposed only after post-plea factual findings: that aggravators exist; that LWOP is appropriate." And for the court to make those findings, he argues, violates *Alleyne*.

¶43 We explained in *State v. Houston* that this provision of the sentencing statute did not violate the Sixth Amendment.[53] In that case, the defendant pled guilty to aggravated murder, punishable by "either life with the possibility of parole or LWOP."[54] This meant that "[t]here were no factual findings to be made by a jury, only a determination that LWOP would or would not be appropriate."[55] And although we decided this issue in *Houston* based solely on *Apprendi*, the logic remains unchanged under *Alleyne*.

¶44 When Mullins pled guilty to aggravated murder, the court did not and could not make any factual findings that would have "produced a higher range" of sentences beyond those already permitted by subsection 76-3-207(4).[56] So *Alleyne* does not apply. Mullins's plea exposed him to the possibility of two sentences: life with the possibility of parole and LWOP.[57] In choosing between those two options, the judge merely exercised "broad sentencing

---

[52] UTAH CODE § 76-3-207(4)(c) (2001). The statute uses "jury" in this provision but also indicates that when it uses "jury," "sentencing judge" may be substituted if the sentencing proceeding does not occur before a jury. UTAH CODE § 76-3-207(4)(a) (2001) ("The court or jury, as the case may be, shall retire to consider the penalty.").

[53] 2015 UT 40, ¶¶ 30–32, 353 P.3d 55. By the time Houston was sentenced, the statute had been amended and re-numbered to place the operative provision in subsection (5). *Compare* Utah Code § 76-3-207(4)(c) (2001) *with* Utah Code § 76-2-207(5)(c) (2008). But the "appropriate[ness]" finding was identical between the two versions of the statute.

[54] *Houston*, 2015 UT 40, ¶ 32.

[55] *Id.*

[56] *See Alleyne*, 570 U.S. at 116; UTAH CODE § 76-3-207(4)(a) (2001).

[57] UTAH CODE § 76-3-207(4)(a) (2001).

discretion" within the available statutory sentencing range.[58] Accordingly, we conclude that Mullins's sentencing process did not violate the Sixth Amendment.

### B. Utah Code Subsection 76-3-207(4) (2001) Is Not Unconstitutionally Vague

¶45 Mullins next argues that the sentencing statute is unconstitutionally vague in violation of due process.[59] At the time of Mullins's sentencing, section 76-3-207 required a judge or jury to determine that it was "appropriate" to sentence an offender to LWOP.[60] Mullins argues that the statute is vague because it does not sufficiently define "appropriate" or convey the constitutional importance of a juvenile's youth in that determination.[61]

¶46 As with his Sixth Amendment claim, Mullins did not mention constitutional vagueness in his original 22(e) motion. Again, he only discussed the Eighth Amendment. Accordingly, the new rule applies to this claim. And again, the State concedes that Mullins's vagueness claim complies with the requirements of the new rule and does not require further factual development, so we reach it on the merits.[62]

¶47 Sentencing statutes are unconstitutionally vague "if they do not state with sufficient clarity the consequences of violating a given criminal statute."[63] Sentencing judges have long been afforded wide discretion in determining sentences, but such discretion does not render a sentencing statute unconstitutional.[64]

---

[58] *See Alleyne*, 570 U.S. at 116; *see also Houston*, 2015 UT 40, ¶ 32 ("By pleading guilty to aggravated murder, [Defendant] admitted all the facts relevant to the offense and became subject to any sentence authorized under Utah law. Under Utah's sentencing statute, a juvenile defendant guilty of aggravated murder can be sentenced to either life with the possibility of parole or LWOP.").

[59] *See* UTAH CODE § 76-3-207(4) (2001).

[60] *See id.* § 76-3-207(4)(a), (c) (2001).

[61] *See id.*

[62] *See supra* ¶¶ 31, 39 n.44.

[63] *State v. Perea*, 2013 UT 68, ¶ 111, 322 P.3d 624 (quoting *United States v. Batchelder*, 442 U.S. 114, 123 (1979)).

[64] *Id.* ¶¶ 114, 117.

Section 76-3-207 governs sentencing for capital felonies. Under the version of the statute applicable at the time of Mullins's sentencing in 2001, a court could impose LWOP only if it found that LWOP was "appropriate."[65]

¶48   Both parties acknowledge that we ruled on the vagueness of section 76-3-207 in *Houston*.[66] The State argues that *Houston* is controlling and dispositive. But Mullins contends that our reasoning in *Houston* was "not very compelling" because the statute "provides no meaningful guidance about how to weigh [aggravating and mitigating] factors against each other." Specifically, the statute does not identify the constitutional significance of a defendant's youth in the "appropriateness" consideration. As a result, he implicitly asks us to overturn our decision in *Houston*. Mullins does not, however, engage in the appropriate analysis for such a request.[67] As such, we decline to overturn *Houston*.

¶49 Additionally, Mullins argues that the federal legal landscape has changed since we decided *Houston*; he specifically contends that the United States Supreme Court's holding in *Johnson v. United States* abrogates our holding in *Houston*.[68] In *Johnson*, the Court found unconstitutionally vague a mandatory sentencing scheme for offenders with prior convictions for violent crimes.[69] The statutory scheme's residual clause imposed a sentencing enhancement if the prior conviction "involve[d] conduct that presents a serious potential risk of physical injury to another."[70] The Court explained that the statute required courts to determine how much risk qualifies as "serious potential risk" and then apply it to the judge's "imagined ordinary case."[71] This intersection of a vague term being given meaning by an abstract and

---

[65] UTAH CODE § 76-3-207(4)(a), (c) (2001).

[66] *See* 2015 UT 40, ¶¶ 47–48.

[67] *See Eldridge v. Johndrow*, 2015 UT 21, ¶¶ 20–41, 345 P.3d 553 (describing the framework through which this court considers whether to overrule its own precedents).

[68] *See Johnson v. United States*, 576 U.S. 591 (2015).

[69] *Id.* at 593–94, 602, 604.

[70] 18 U.S.C. § 924(e)(2)(B)(ii), *invalidated by Johnson*, 576 U.S. 591.

[71] *Johnson*, 576 U.S. at 597–98 (cleaned up).

"wide-ranging" analysis led the Court to declare the statute unconstitutionally vague.[72]

¶50 But as the State points out, the Court's determination in *Johnson* turned on the *combination* of the "imagined ordinary case" analysis and the vagueness of the term "serious potential risk."[73] That case presented two layers of potential ambiguity that, together, violated due process. By contrast, the sentencing statute here requires no judicial imagination and offers specific mitigating and aggravating factors to guide the judge's determination of "appropriateness" in each case.[74] Therefore, *Johnson* does not abrogate *Houston*, and our holding that Utah Code section 76-3-207 is constitutional stands.

### C. We Do Not Reach Whether Imposing JLWOP on an Intellectually Disabled Juvenile Is Categorically Unconstitutional Under the Federal and Utah Constitutions

¶51 Mullins next claims that it was unconstitutional under both the federal and state constitutions to sentence him to JLWOP because two United States Supreme Court decisions,[75] when taken together, prohibit imposing JLWOP on intellectually disabled juveniles. Mullins did not mention his intellectual disability in his original motion, and he likewise failed to mention the main case on which he relies for this argument, *Atkins v. Virginia*.[76] Thus, the new rule applies to this claim.

¶52 The State argues that Mullins failed to show that his claim is based on "a rule established or ruling issued by" a binding court, as the new rule requires.[77] Instead, Mullins "cobbl[ed] together two existing but unrelated rules."

¶53 The State has a point. Mullins presents two cases that independently established new rules. The Court in *Atkins* established that intellectually disabled individuals cannot be

---

[72] *Id.* at 596–97.

[73] *See id.* at 596–98 (cleaned up).

[74] *See* UTAH CODE § 76-3-207(3)–(4) (2001).

[75] *See Atkins v. Virginia*, 536 U.S. 304 (2002); *Graham v. Florida*, 560 U.S. 48 (2010).

[76] 536 U.S. 304.

[77] *See* UTAH R. CRIM. P. 22(e)(2) (2025).

sentenced to capital punishment.[78] And the Court in *Graham v. Florida* established that juveniles who have not committed homicide cannot be sentenced to JLWOP.[79] In the latter case, the Court stated that JLWOP "share[s] some characteristics with death sentences that are shared by no other sentences."[80] But it does not support the claim that Mullins now makes: that all JLWOP sentences should be treated as capital punishment in all circumstances. So Mullins's claim would require us to determine whether JLWOP is equivalent to capital punishment. If we must decide that now, the rule is not already established. And subparagraph (e)(2) of the new rule requires that a challenge to an illegal sentence be based on "a rule established or ruling issued by" a binding court.[81]

¶54 Mullins also makes no attempt to show that his proposed rule is based on new, binding caselaw interpreting the Utah Constitution. So we do not reach his claim under the Utah Constitution either.

### D. *We Do Not Reach Whether JLWOP Sentences Are Categorically Unconstitutional Under Article I, Section 9 of the Utah Constitution*

¶55 Mullins's fifth claim also challenges the constitutionality of JLWOP generally, this time solely under article I, section 9 of the Utah Constitution. He argues that under today's national consensus, a sentence of JLWOP is cruel and unusual. But Mullins never referred to the Utah Constitution in his original motion; he referred only to United States Supreme Court cases. Because he brings his current claim under the Utah Constitution, the new rule applies.

¶56 Mullins's claim does not meet the requirements of the new rule, however, because it is not based on a "a rule established or ruling issued" by a binding appellate court.[82] We previously rejected an almost identical constitutional challenge to JLWOP in

---

[78] 536 U.S. at 321.

[79] 560 U.S. at 82.

[80] *Id.* at 69.

[81] UTAH R. CRIM. P. 22(e)(2) (2025).

[82] *See id.*

*Houston*.[83] Mullins argues that the national consensus has changed since we decided that case. But in doing so, he identifies no precedent from a controlling Utah court indicating that the national consensus has changed. His argument, then, is not premised on a rule or ruling issued by a controlling court. As such, we do not reach the merits of this claim.[84]

### E. JLWOP Is Not Categorically Unconstitutional Under the Eighth Amendment to the United States Constitution

¶57 Mullins next asks us to overturn another aspect of our decision in *Houston* and hold that a sentence of JLWOP is, without exception, unconstitutional under the Eighth Amendment's prohibition of cruel and unusual punishment. Because this claim fails on its merits under either version of rule 22(e), we need not ask which rule applies nor whether the claim meets the requirements of that rule.

¶58 Courts assess claims of cruel and unusual punishment under the United States Constitution by looking to the "evolving standards of decency that mark the progress of a maturing society."[85] This standard requires us to consider whether a punishment is proportionate to a crime based on "a national consensus against the sentencing practice at issue" and an exercise of the court's "independent judgment."[86]

---

[83] 2015 UT 40, ¶¶ 64–68.

[84] In the alternative, Mullins argues that the Utah Constitution requires a sentencing court to make an on-the-record finding of permanent incorrigibility—a procedural requirement rejected by the United States Supreme Court under the United States Constitution. *See Jones v. Mississippi*, 593 U.S. 98, 101 (2021); *see also infra* ¶¶ 71–72. As with his claim that JLWOP is categorically forbidden by the Utah Constitution, Mullins asks us to declare a new rule, rather than rely on binding precedent from this court or the United States Supreme Court. We therefore may not reach the merits of his claim under the new rule. *See* UTAH R. CRIM. P. 22(e)(2) (2025).

[85] *Graham*, 560 U.S. at 58 (cleaned up).

[86] *Id*. at 61.

¶59 In *Houston*, we addressed this same argument and declined to hold that JLWOP was categorically unconstitutional.[87] We based our analysis on binding United States Supreme Court precedent and explained that although "juveniles represent a unique class warranting special considerations in sentencing[,] . . . the unique characteristics of youth are accounted for, both by Utah law and through federal constitutional protections."[88] We also noted that "a great majority of states . . . permit LWOP sentences for juveniles" and declined to "conclude that the 'national consensus' favors the prohibition of LWOP for juveniles convicted of homicide."[89]

¶60 Mullins argues that the national consensus on JLWOP has sufficiently evolved since *Houston* for us to revisit the matter, given the decrease from thirty-nine states allowing JLWOP to twenty-five plus the District of Columbia. But he provides little evidence of changes in actual sentencing practices, an essential factor in the national consensus analysis when the legislative data are inconclusive.[90]

¶61 In our view, a decrease from thirty-nine states permitting JLWOP by statute to twenty-five, without any information on actual sentencing practices, is not so great an evolution as to overcome the United States Supreme Court's established precedent, which the Court endorsed as recently as 2021.[91] Although states are trending away from permitting JLWOP, we agree with the State that, taken alone, half of the states plus the District of Columbia banning JLWOP do not a national consensus make. Again, we decline to overturn *Houston*.

---

[87] 2015 UT 40, ¶¶ 52–63.

[88] *Id.* ¶ 60.

[89] *Id.* ¶ 62 (noting that, as of 2010, thirty-nine states allowed LWOP sentences for juvenile offenders convicted of homicide).

[90] *See Graham*, 560 U.S. at 61, 66 (stating that a court considers "indicia of society's standards, as expressed in legislative enactments and state practice" and basing its holding, in part, on the fact that "life without parole sentences for juveniles convicted of nonhomicide crimes [are] as rare [in practice] as other sentencing practices found to be cruel and unusual" (cleaned up)).

[91] *See Jones*, 593 U.S. 98.

### F. Mullins's Sentence Violated the Eighth Amendment Under Miller v. Alabama

¶62 Mullins's final claim is that a JLWOP sentence was unconstitutional under the Eighth Amendment as applied to his case. Mullins argues that under *Miller v. Alabama* and its progeny, as someone whose crimes reflected transient immaturity, he could not constitutionally be sentenced to JLWOP.[92] He further argues that the sentencing court "recognized that Mr. Mullins could still change"—a fact that should have precluded a JLWOP sentence under the standards set forth in *Miller* and subsequent cases.

¶63 Mullins adequately raised this claim in his original motion and argument to the district court, so we consider it under the old rule.[93] Our reviewability requirement, however, bars part of his argument.[94] In particular, Mullins asserts that "the undisputed record establishes that [his] crime reflected the transient immaturity of his youth." He claims that the record shows a complete absence of moral guidance in his childhood home and that his parents affirmatively encouraged criminal behavior. While the record shows that his childhood was likely deeply traumatic, crime caused by a traumatic past is not the same as crime caused by youthful immaturity. And without further factual development, we cannot say whether Mullins's crime was actually the result of his youth. Under our precedents for the old rule, we cannot engage in such a fact-intensive inquiry and thus cannot address this aspect of Mullins's claim.[95]

¶64 We do consider, however, Mullins's argument that the judge improperly sentenced him to JLWOP even though he

---

[92] *See* 567 U.S. 460 (2012); *Montgomery v. Louisiana*, 577 U.S. 190 (2016); *Jones*, 593 U.S. 98.

[93] Mullins's motion cited *Miller*, arguing that a judge must "have the opportunity to consider mitigating circumstances before imposing" JLWOP, and the record did not indicate that "the court took into consideration the defendant's youth" or "the possibility of rehabilitation." *See Noor v. State*, 2019 UT 3, ¶ 51 n.64, 435 P.3d 221 ("[A] party acting pro se should be accorded every consideration that may be reasonably indulged because of his lack of technical knowledge of law and procedure." (cleaned up)).

[94] *See Houston*, 2015 UT 40, ¶¶ 24–26; *supra* ¶¶ 24–27.

[95] *See Houston*, 2015 UT 40, ¶¶ 18, 27; *supra* ¶¶ 24–27.

"recognized that Mr. Mullins could still change." Though this argument has factual underpinnings, it raises questions we can answer on the record before us. The parties do not dispute the contents of the transcripts of the sentencing hearing or the original 22(e) motion hearing, and a fresh look at the case by the district court would not shed any additional light on what the sentencing judge considered or concluded when sentencing Mullins. Because we would not need to find any facts outside the record, nor would we need to rely on any disputed facts in the record to analyze this claim, we conclude that this aspect of Mullins's claim is within the scope of the old rule.

¶65 Mullins's claim turns on recent federal caselaw emphasizing the constitutional differences between adults and juveniles and declaring certain penalties disproportionate when applied to juveniles. The Eighth Amendment requires that punishment be proportionate "to both the offender and the offense."[96] Proportionality "requires consideration of the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question."[97] Under that framework, a sentencing court must account for a juvenile's "lessened culpability and greater capacity for change" as compared to that of an adult.[98] In *Miller v. Alabama*, the United States Supreme Court declared that mandatory JLWOP sentencing schemes are unconstitutional because they prohibit that accounting.[99]

¶66 Drawing on *Roper v. Simmons* and *Graham v. Florida*, the Court in *Miller* emphasized that "children are different."[100] Youth both "lessen[s] a child's moral culpability and enhance[s] the prospect that, as the years go by and neurological development occurs, [the child's] deficiencies will be reformed."[101] The Court

---

[96] *Miller*, 567 U.S. at 469; *see also* U.S. CONST. amend. VIII.

[97] *Graham*, 560 U.S. at 67.

[98] *Miller*, 567 U.S. at 465 (cleaned up).

[99] *See id.* at 465, 475–77.

[100] *Id.* at 480; *see also Roper v. Simmons*, 543 U.S. 551, 578 (2005) (declaring the death penalty for juvenile offenders unconstitutional); *Graham*, 560 U.S. at 82 (declaring JLWOP unconstitutional for non-homicide juvenile offenders).

[101] *Miller,* 567 U.S. at 472 (cleaned up).

reasoned that the characteristics of youth render ordinary penological justifications less rational.[102] Because youth lessens an offender's culpability for their actions, however horrible, "the case for retribution is not as strong with a minor as with an adult."[103] Similarly, deterrence is less effective because children's "immaturity, recklessness, and impetuosity . . . make them less likely to consider potential punishment" in making decisions.[104] A lifetime sentence is generally justified by concluding that an offender will be a perpetual danger to others if released from prison—but such a conclusion requires finding the offender "incorrigible," and "incorrigibility is inconsistent with youth."[105] Finally, while the criminal justice system ordinarily aims to rehabilitate offenders, any LWOP sentence "forswears altogether the rehabilitative ideal" and instead rests on "an irrevocable judgment about an offender's value and place in society."[106] That immutable judgment is "at odds with a child's capacity for change."[107] Because a JLWOP sentence could not serve these legitimate functions in an ordinary case, the sentence is disproportionate for most juvenile offenders.[108]

¶67   The Court in *Miller* did "not categorically bar a penalty for a class of offenders or type of crime," instead "mandat[ing] only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing" JLWOP.[109] But the Court concluded by stating that given "children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon."[110]

---

[102] *Id.* at 472–73 (citing *Roper*, 543 U.S. 551; *Graham*, 560 U.S. 48).

[103] *Id.* at 472 (cleaned up) (quoting *Graham*, 560 U.S. at 71).

[104] *Id.*

[105] *Id.* at 472–73 (cleaned up).

[106] *Id.* at 473 (cleaned up).

[107] *Id.*

[108] *Id.* at 479–80.

[109] *Id.* at 483.

[110] *Id.* at 479.

¶68 A few years later, in *State v. Houston*, this court held that the Utah sentencing scheme allowing a court to impose JLWOP was facially constitutional.[111] Relying on *Miller* and related federal precedents, the court determined that "the Eighth Amendment does not prohibit the imposition of LWOP for a juvenile homicide offender."[112] And Utah's "statutory scheme enable[d] the kind of individualized sentencing determination that the Supreme Court has deemed necessary for serious offenses."[113] In sum, because the sentencing statute did not mandate a JLWOP sentence and instead granted discretion to the sentencer to impose a lesser sentence, it did not, on its face, violate the Eighth Amendment.[114]

¶69 A year later, in *Montgomery v. Louisiana*, the United States Supreme Court held that *Miller* applies retroactively to juveniles who were sentenced to JLWOP before the Court decided *Miller*.[115] To find the rule retroactive, the Court concluded that *Miller* announced a substantive constitutional rule, as opposed to a procedural one.[116] The Court recognized that *Miller* had a procedural component, requiring a discretionary sentencing scheme that allows a sentencer to consider youth as a factor before imposing a JLWOP sentence.[117] But "[p]rotection against disproportionate punishment is the central substantive guarantee of the Eighth Amendment and goes far beyond the *manner* of determining a defendant's sentence."[118] And "mandatory life-without-parole sentences for children pose too great a risk of disproportionate punishment."[119]

¶70 The Court clarified that *Miller* went further than simply requiring a sentencing court to weigh a defendant's youth.[120] *Miller*

---

[111] 2015 UT 40, ¶¶ 52–53; *see also* UTAH CODE § 76-3-207 (2008).

[112] *Houston*, 2015 UT 40, ¶ 55.

[113] *Id.* ¶ 61.

[114] *Id.* ¶¶ 61–63.

[115] 577 U.S. at 206–12.

[116] *Id.* at 209.

[117] *Id.* at 209–10.

[118] *Id.* at 206 (emphasis added).

[119] *Id.* at 208 (cleaned up).

[120] *Id.*

"established that the penological justifications for life without parole collapse in light of 'the distinctive attributes of youth.'"[121] Thus, "[e]ven if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects 'unfortunate yet transient immaturity.'"[122] Because *Miller* barred JLWOP for all but the rarest offenders, it "rendered life without parole an unconstitutional penalty for . . . juvenile offenders whose crimes reflect the transient immaturity of youth"—a substantive, and thus retroactive, constitutional protection.[123]

¶71   The Supreme Court next heard a JLWOP case in *Jones v. Mississippi*.[124] *Jones* considered whether *Miller* required a sentencer to "make a separate factual finding that the defendant is permanently incorrigible" or to otherwise include an implicit finding of incorrigibility on the record.[125] The Court clarified that a sentencing court must consider "youth as a sentencing factor akin to a mitigating circumstance" under the Court's death penalty jurisprudence.[126] Relying on language from *Montgomery* declaring that a sentencer need not make an express factual finding of incorrigibility, the Court rejected Jones's effort to overturn his JLWOP sentence.[127]

¶72   In its language, the Court in *Jones* seemed to step back from the broadest reading of both *Miller* and *Montgomery*, stating that under those cases "a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient."[128] But the Court also expressly declined to overrule *Miller* or

---

[121] *Id.* (quoting *Miller*, 567 U.S. at 472).

[122] *Id.* (quoting *Miller*, 567 U.S. at 479).

[123] *Id.* at 208–09 ("Like other substantive rules, *Miller* is retroactive because it necessarily carries a significant risk that a defendant—here, the vast majority of juvenile offenders—faces a punishment that the law cannot impose upon him." (cleaned up)).

[124] 593 U.S. 98.

[125] *Id.* at 101.

[126] *Id.* at 108.

[127] *Id.* at 101.

[128] *Id.* at 105.

*Montgomery*,[129] instead framing the question it resolved as merely whether to adopt "an *additional* constitutional requirement that the sentencer must make a finding of permanent incorrigibility before sentencing a murderer under 18 to life without parole."[130] The Court repeatedly reiterated that clear language in *Miller* and *Montgomery* dictated its answer to that question: that no such finding was required.[131] And the Court quoted in a footnote a "key paragraph" from *Montgomery*, stating that the absence of "a formal factfinding requirement does not leave States free to sentence a child whose crime reflects transient immaturity to life without parole."[132]

¶73   Having reviewed the relevant precedents, we turn now to Mullins's principal argument. He asserts that his JLWOP sentence was unconstitutional because the sentencing court in his case affirmatively "recognized that [he] could still change" but then sentenced him to JLWOP. Though this court and the United States Supreme Court have both recognized that JLWOP is constitutionally permissible in some cases, neither court has declared that it is permissible in all cases, nor considered the specific claim Mullins raises here.[133]

---

[129] *Id.* at 118 ("Today's decision does not overrule *Miller* or *Montgomery*."); *see also id.* at 144 (Sotomayor, J., dissenting) ("[S]entencers should hold this Court to its word: *Miller* and *Montgomery* are still good law.").

[130] *Id.* at 119 (majority opinion) (emphasis added).

[131] *Id.* at 109–10, 113, 119.

[132] *Id.* at 106 n.2 (quoting *Montgomery*, 577 U.S. at 211).

[133] *See id.* at 115; *Miller*, 567 U.S. at 483; *Houston*, 2015 UT 40, ¶ 55. In fact, the United States Supreme Court in *Jones* expressly declined to explore whether a sentencer who refused to consider a defendant's youth would violate that youth's Eighth Amendment right. 593 U.S. at 115 n.7; *see also id.* at 120 (declining to consider "any as-applied Eighth Amendment claim of disproportionality"); *id.* at 144 n.6 (Sotomayor, J., dissenting) (noting that a juvenile as-applied claim "should be controlled by this Court's holding that sentencing a child whose crime reflects transient immaturity to life without parole is disproportionate under the Eighth Amendment" (cleaned up)).

¶74 We agree with Mullins that if a sentencing court affirmatively finds that a juvenile offender can change, a JLWOP sentence is unconstitutional. "[T]he characteristics of youth, and the way they weaken rationales for punishment, can render a life-without-parole sentence disproportionate."[134] And under *Miller* and its progeny, if a child is capable of change and reform, that is, is not incorrigible, a JLWOP sentence *is* disproportionate and unconstitutional.[135] A sentencing court has no obligation to make an on-the-record finding of permanent incorrigibility before imposing a JLWOP sentence.[136] But a contrary finding bars the court from imposing JLWOP.[137]

¶75 As we explained in *Houston*, Utah's sentencing scheme provides the sentencing court an opportunity to consider mitigating factors—including a defendant's youth—and, in its

---

[134] *Miller*, 567 U.S. at 473.

[135] *Montgomery*, 577 U.S. at 211.

[136] *See Jones*, 593 U.S. at 113.

[137] *See Montgomery*, 577 U.S. at 211; *Jones*, 593 U.S. at 119 (expressly declining to overrule *Montgomery*). Our sister courts are divided over the proper interpretation of these difficult cases. *Compare, e.g.*, *State v. Kelliher*, 873 S.E.2d 366, 380 (N.C. 2022) ("[C]onsistent with *Miller*, *Montgomery*, and *Jones*, we conclude that the Eighth Amendment categorically prohibits a sentencing court from sentencing any juvenile to life without parole if the sentencing court has found the juvenile to be neither incorrigible nor irredeemable." (cleaned up)), *and Malvo v. State*, 281 A.3d 758, 765 (Md. 2022) (addressing "a situation in which a sentencing court finds that a crime was the result of the offender's transient immaturity but nonetheless sentences the offender to life without parole" and concluding that "an offender deemed corrigible cannot constitutionally be sentenced to" JLWOP), *with People v. Wilson*, 220 N.E.3d 1068, 1077 (Ill. 2023) ("[N]o viable *Miller* claim exists, so long as the [JLWOP] sentence is not mandatory . . . ." (cleaned up)), *and Commonwealth v. Felder*, 269 A.3d 1232, 1243 (Pa. 2022) (same). It is clear from these cases that reasonable jurists—including our dissenting colleagues here—may disagree with our reading. Still, we believe this reading is the most appropriate application of Eighth Amendment principles and federal caselaw.

discretion, to hand down a JLWOP sentence.[138] The United States Supreme Court has stated that if a sentencer has discretion to consider youth, we presume that the sentencer did consider youth.[139] This court has recognized a similar presumption of regularity as to trial court findings, holding that "this court upholds the trial court even if it failed to make findings on the record whenever it would be reasonable to assume that the court actually made such findings."[140] Thus, as a rule, though JLWOP is disproportionate for offenders who are not permanently incorrigible, we presume that judges use their discretion appropriately when issuing criminal sentences.

¶76  But the presumption of regularity afforded to sentencing proceedings may be rebutted. A sentencing judge's affirmative statements finding that a juvenile can change or that their crime was the result of mere transient immaturity are enough to overcome the presumption that a sentencer acted in accordance with the Eighth Amendment. Stated differently, the Eighth Amendment's proportionality requirement can override the presumption of regularity when the judge's own words conflict with a finding of permanent incorrigibility.

¶77  We now turn to the facts of Mullins's case. At sentencing, Mullins's counsel emphasized that he was asking the court to "simply allow the Board of Pardons . . . some discretion at some time in the very distant future to be able to make a decision about whether or not parole is even a possibility for Mr. Mullins." Counsel highlighted that Mullins "never had a chance at a normal life" due to his "profoundly dysfunctional upbringing." And counsel argued that because Mullins came from a "dysfunctional horrific environment," removing him from that environment would create a meaningful opportunity for him to learn and change.

¶78 Following counsel's arguments and admission of a psychological report, the sentencing judge stated, "If you're trying

---

[138] *Houston*, 2015 UT 40, ¶ 61.

[139] *Jones*, 593 U.S. at 114. In part on that basis, the Court in *Jones* declined to require an on-the-record factual finding of permanent incorrigibility or any similar declaration of a sentencer's reasoning before imposing JLWOP. *Id.* at 114–18.

[140] *State v. Helms*, 2002 UT 12, ¶ 11, 40 P.3d 626 (cleaned up).

to assess the level of hope for the future you hold out for Mr. Mullins, I don't see anything in [the psychological] report on how to assess hope for change." In response, counsel declared, "I don't want to say that hope for change is irrelevant, but it almost doesn't matter what we hope"—instead putting sole responsibility for evaluating Mullins's ability to change on the Board of Pardons and Parole. Counsel further stated that "[w]e cannot predict what Mr. Mullins himself will do by way of coming to a realiz[ation] inside himself to change." The judge then imposed a JLWOP sentence, stating that "when I balance . . . the family's requests and Mr. Mullins'[s] request and the need to send a message," JLWOP was appropriate. Wrapping up the hearing, the judge opined, "I sincerely hope it's the right judgment, Mr. Mullins, and if you're gonna be with us for a long time and have a chance to change, I hope—not under the present circumstances—I'm hoping that you'll find some way to be productive."

¶79   Mullins argues that the judge's comments show that "the judge was not convinced beyond a reasonable doubt that Mr. Mullins could never change." On that basis, he requests that his sentence be modified to make him eligible for parole.

¶80   We cannot say that we agree. The record does not show an affirmative factual finding that Mullins was capable of change—the showing necessary for us to declare Mullins's sentence unconstitutional as a matter of law and immediately modify his sentence to permit the possibility of parole.

¶81   Even still, the judge's comments raise meaningful ambiguity about whether a JLWOP sentence was appropriate here. We agree with Mullins that the judge here both contemplated his ability to change—one of the important features of youth—and may have implicitly concluded that Mullins had a capacity to change. After the judge's statement that he did not know how to judge capacity for change, and counsel's arguments that the issue was better left to the Board of Pardons and Parole, and hardly relevant for the sentencing judge, the judge did not conclude the hearing. Rather, the judge made his comment suggesting some "hope" that Mullins might have a "chance to change." The judge then affirmatively sentenced Mullins to JLWOP—a sentence incompatible with a suggestion that Mullins could change.

¶82   While we cannot say that Mullins is the type of juvenile offender for whom JLWOP is categorically disproportionate—the judge did not make that finding, and this court cannot evaluate that

question in the first instance—the judge's comments raise real concerns that Mullins may fall into that category. Given that "a lifetime in prison is a disproportionate sentence for all but the rarest of children,"[141] the judge's statements undermine our confidence that JLWOP was an appropriate and constitutional sentence.

¶83 The fact that Mullins was sentenced before *Miller* and its progeny were issued strengthens our conclusion because the sentencing judge lacked notice of the constitutional import of Mullins's youth.[142] When the court sentenced Mullins in 2002, controlling caselaw did not indicate that juveniles should receive special consideration when being sentenced. Indeed, sentencing a juvenile to death—a more severe punishment than JLWOP—was still constitutionally permissible.[143] And the United States Supreme Court had rejected the argument that juveniles were different from adults because they have "less developed cognitive skills," are "less mature and responsible," and are "less morally blameworthy."[144] Additionally, the Court stated that juvenile transfer statutes[145] adequately "ensure individualized consideration of the maturity and moral responsibility" of a juvenile "before they are even held to stand trial as adults."[146] In other words, the Court allowed for the possibility that a juvenile's individual maturity and responsibility need not be considered at all during sentencing. If

---

[141] *Montgomery*, 577 U.S. at 195.

[142] *See, e.g.*, *State v. Null*, 836 N.W.2d 41, 76 (Iowa 2013) (similarly noting that the district court lacked "the benefit of *Miller*" during sentencing, and providing an opportunity to reconsider the appropriate sentence for a juvenile upon remand); *Malvo*, 281 A.3d at 772 (vacating a JLWOP sentence when a judge's ambiguous comments suggested he had not weighed the defendant's youth and ability to change, emphasizing that defendant was sentenced before *Miller* and that the court need not "presume that a sentencing judge is clairvoyant").

[143] *See Stanford v. Kentucky*, 492 U.S. 361, 380 (1989), *overruled by Roper*, 543 U.S. 551.

[144] *Stanford*, 492 U.S. at 377–79.

[145] Transfer statutes "allow[] or mandate[] the trial of a juvenile as an adult in a criminal court for a criminal act." *Transfer Statute*, BLACK'S LAW DICTIONARY (12th ed. 2024).

[146] *Stanford*, 492 U.S. at 375.

even the death penalty for juveniles served legitimate penological goals under controlling caselaw, and constitutional law did not yet mandate individualized consideration of youth at sentencing, then there is no basis to assume that a sentencing judge at that time would have understood the constitutional rights implicated by sentencing a youth to JLWOP.

¶84  In contrast, *Miller* and *Montgomery* marked a turning point, together making clear that a JLWOP sentence is disproportionate for juvenile defendants who possess the capacity to change.[147] Under *Miller*, a sentencing court must consider a juvenile's youth and its attendant characteristics.[148] "[I]mposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children."[149] The sentencing court must have the opportunity to consider the "mitigating qualities of youth," such as "immaturity, impetuosity, and failure to appreciate risks and consequences" as well as the peer pressures and the familial environment that surround the juvenile.[150] The fact that the sentencing court did not have the benefit of this caselaw, combined with its ambiguous remarks about Mullins's prospects for change, suggests "too great a risk of disproportionate punishment" here.[151] It is "unclear at best whether [Mullins's] sentencing proceeding complied with the Eighth Amendment."[152] We conclude that the potential constitutional violation here "threaten[s] the validity of the sentence," rendering the sentence illegal under the old rule

---

[147] *Miller*, 567 U.S. at 479–80; *Montgomery*, 577 U.S. at 209–10 (recognizing *Miller*'s "substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity").

[148] *See* 567 U.S. at 465, 470–80.

[149] *Id*. at 474.

[150] *Id*. at 476–77 (cleaned up).

[151] *See id*. at 479.

[152] *See Malvo*, 281 A.3d at 773 ("In our view, the legality of a sentence under the Eighth Amendment is not a topic for this Court's speculation.").

22(e).[153] Accordingly, we vacate Mullins's sentence and remand for resentencing consistent with *Miller* and its progeny.[154]

¶85 We turn then to the question of remedy. Mullins requests that this court "correct [his] sentence by giving him the chance to seek parole." And indeed the United States Supreme Court has suggested that simply enabling a defendant to seek parole may be an appropriate path under *Miller*.[155] We therefore do not fault Mullins for seeking that remedy. But the Court left to the states to determine whether resentencing or mere parole eligibility is appropriate when a juvenile's sentencing process violated the Eighth Amendment.[156] As we have noted, in instances where the record reflects an affirmative finding that a juvenile is capable of change—in other words, not permanently incorrigible—or that the crime was the result of transient immaturity, JLWOP is unconstitutionally disproportionate. In such cases, a resentencing proceeding in which the sentencing court could again impose JLWOP would be inappropriate.

¶86 Here, however, the record does not reflect such an unambiguous finding. Accordingly, we can only speculate as to whether Mullins is one of the rare individuals "whose crimes reflect irreparable corruption."[157] We leave it to the sentencing court on remand to determine the appropriate sentence here, considering Mullins's youth as required by the Eighth Amendment, consistent with *Miller* and this opinion.[158]

## CONCLUSION

¶87 Mullins brings seven claims in his challenge to his sentence. We either reject or do not reach six of his seven claims. As to his final claim, Mullins argues that although the court considered

---

[153] *State v. Candedo*, 2010 UT 32, ¶ 14, 232 P.3d 1008.

[154] *See Miller*, 567 U.S. at 474, 479, 489; *Jones*, 593 U.S. at 111–12 (noting that appropriate sentencing proceedings under *Miller* "help[] ensure that life-without-parole sentences are imposed only in cases where that sentence is appropriate in light of the defendant's age").

[155] *See Montgomery*, 577 U.S. at 212.

[156] *See id.*

[157] *Id.* at 209.

[158] *See generally Miller*, 567 U.S. 460.

his youth and suggested he could change, the court nevertheless sentenced him to JLWOP, which was disproportionate under the Eighth Amendment. We agree that the sentencing court's ambiguous comments on the record undermine our confidence that JLWOP was a constitutionally proportionate sentence here. Although the sentencing judge considered Mullins's youth, he did so without understanding its full constitutional import, as set forth in *Miller* and its progeny. This, taken together with the sentencing court's suggestion that Mullins might have the capacity for change, leaves us lacking confidence in the sentencing decision. Accordingly, we vacate Mullins's sentence and remand to the district court for resentencing consistent with this opinion.

---

JUSTICE HAGEN, concurring in part and dissenting in part from the Opinion of the Court:

¶88   We join the opinion of the court, except as to the majority's holding in Part II.F that Mullins's sentence violates the Eighth Amendment. The majority concludes that *Miller v. Alabama*, 567 U.S. 460 (2012), and its progeny hold that "if a child is capable of change and reform, that is, is not incorrigible, a JLWOP sentence *is* disproportionate and unconstitutional." *Supra* ¶ 74. Based on that interpretation of the governing law, the majority reasons that "if a sentencing court affirmatively finds that a juvenile offender can change, a JLWOP sentence is unconstitutional." *Supra* ¶ 74. Although the sentencing court did not make such a finding here, the majority concludes that the court's ambiguous statement about a "chance to change" undermines its confidence in the constitutionality of the sentence and requires resentencing. *Supra* ¶¶ 80–81.

¶89   We disagree with the premise of the majority's holding. In our reading, *Miller* and its progeny stand for the narrower proposition that, to comply with the Eighth Amendment, a sentencing judge must have discretion to impose a non-JLWOP sentence based on an individualized assessment of the unique circumstances presented in the case. Although the United States Supreme Court has sent mixed messages about when a juvenile can be sentenced to JLWOP without violating the Eighth Amendment, its most recent pronouncement on this issue was perfectly clear: "In a case involving an individual who was under 18 when he or she committed a homicide, a State's discretionary sentencing system is

both constitutionally necessary and constitutionally sufficient." *Jones v. Mississippi*, 593 U.S. 98, 105 (2021).

¶90 When Mullins was sentenced, the district court had discretion to impose a lesser sentence. And, in making that determination, the court was free to consider all mitigating factors, including Mullins's youth and attendant circumstances. That is all the *Miller* line of cases requires.

¶91 Beginning in 2005, the Court decided a series of cases that recognized that "youth matters in sentencing." *See id.* First, in *Roper v. Simmons*, the Court held that sentencing a juvenile offender to death violated the Eighth Amendment. 543 U.S. 551, 578 (2005). Five years later, in *Graham v. Florida*, the Court held that a JLWOP sentence for crimes other than homicide also violated the Eighth Amendment. 560 U.S. 48, 82 (2010). These cases "establish[ed] that children are constitutionally different from adults for purposes of sentencing" due to their "diminished culpability and greater prospects for reform." *Miller*, 567 U.S. at 471.

¶92 In *Miller*, the Court confronted the question of whether imposing mandatory JLWOP on juvenile homicide offenders violated the Eighth Amendment. *See id.* at 465. The Court looked to two lines of cases—the *Roper* and *Graham* cases categorically banning certain punishments for classes of juvenile offenders, and its adult death penalty cases "requiring that sentencing authorities consider the characteristics of a defendant and the details of his offense before sentencing him to death." *Id.* at 470. The Court concluded that "*Graham*, *Roper*, and our individualized sentencing decisions make clear that a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." *Id.* at 489. Because JLWOP is the harshest penalty available for juvenile homicide offenders, the Court held that sentencing schemes that require mandatory JLWOP violate the Eighth Amendment because they "preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it." *Id.* at 476.

¶93 A few years later, the Court was tasked with deciding whether the rule it announced in *Miller* was retroactive. *See Montgomery v. Louisiana*, 577 U.S. 190 (2016). Under the Court's precedent, "a new constitutional rule of criminal procedure does not apply, as a general matter, to convictions that were final when the new rule was announced." *Id.* at 198. But "new substantive rules of constitutional law" are retroactive. *Id.* So the question was

whether *Miller* announced a procedural rule requiring individualized sentencing before imposing a JLWOP sentence or a substantive rule prohibiting JLWOP for a particular class of juveniles. *See id.* at 206–12.

¶94 A discerning reader of the *Miller* decision would have assumed that it announced a procedural rule. After all, *Miller* said as much: "Our decision does not categorically bar a penalty for a class of offenders or type of crime—as, for example, we did in *Roper* or *Graham*. Instead, it mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." *Miller*, 567 U.S. at 483.

¶95 Yet the *Montgomery* court asserted that "*Miller* . . . did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole." *Montgomery*, 577 U.S. at 208. Over a sharp dissent that accused the majority of rewriting *Miller*, *see generally id.* at 224 (Scalia, J., dissenting), the Court held that *Miller* announced a substantive rule:

> Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects unfortunate yet transient immaturity. Because *Miller* determined that sentencing a child to life without parole is excessive for all but the rare juvenile offender whose crime reflects irreparable corruption, it rendered life without parole an unconstitutional penalty for a class of defendants because of their status—that is, juvenile offenders whose crimes reflect the transient immaturity of youth.

*Id.* at 208 (majority opinion) (cleaned up). The Court acknowledged that *Miller* did not require a sentencing court to make a factual finding of incorrigibility, but it explained that the lack of "a formal factfinding requirement does not leave States free to sentence a child whose crime reflects transient immaturity to life without parole. To the contrary, *Miller* established that this punishment is disproportionate under the Eighth Amendment." *Id.* at 211.

¶96 If *Montgomery* had been the Supreme Court's last word on the subject, we would readily agree with the majority that JLWOP is categorically disproportionate in violation of the Eighth Amendment for juveniles whose crimes reflect the transient

immaturity of youth rather than permanent incorrigibility. But the Supreme Court has since retreated from *Montgomery*'s interpretation of *Miller*. It is at this point that our interpretation of the governing caselaw diverges from that of the majority.

¶97  In *Jones v. Mississippi*, the Court was squarely confronted with the question of whether, before imposing a JLWOP sentence, a sentencer must make an express factual finding of permanent incorrigibility or "must at least provide an on-the-record sentencing explanation with an implicit finding of permanent incorrigibility." 593 U.S. at 113 (cleaned up). The Court held that no express or implicit finding of permanent incorrigibility is needed before imposing JLWOP because *Miller* requires only a "discretionary sentencing procedure" to comport with the Eighth Amendment. *Id.* at 110. The Court explained that "*Miller* declined to characterize permanent incorrigibility as . . . an eligibility criterion," and instead treated "youth as a sentencing factor akin to a mitigating circumstance." *Id.* at 108. Just as "th[e] Court has required for the individualized consideration of mitigating circumstances in capital cases," *id.*, *Miller* requires individualized sentencing because mandatory JLWOP "poses too great a risk of disproportionate punishment," *id.* at 110 (cleaned up). But like the consideration of mitigating factors in capital cases, the Eighth Amendment does not require that the sentencer weigh the mitigating circumstances in any particular way or make "an implicit finding regarding those mitigating circumstances." *Id.* at 116.

¶98 The Court concluded that Jones's JLWOP sentence complied with *Miller* "because the sentence was not mandatory and the trial judge had discretion to impose a lesser punishment in light of Jones's youth." *Id.* at 120. The trial judge was not required to find—even implicitly—that the crime was a result of permanent incorrigibility as opposed to the transient immaturity of youth. *Id.* at 118.

¶99 Both the concurrence and the dissent criticized the majority's opinion as irreconcilable with *Montgomery*. *See id.* at 121–29 (Thomas, J., concurring); *id.* at 129–51 (Sotomayor, J., dissenting). The majority acknowledged the tension between "the procedural function of *Miller*'s rule" and *Montgomery*'s holding "that the *Miller* rule was substantive for retroactivity purposes," *id.* at 110 (majority opinion), but it insisted that it was not overruling *Montgomery* because *Montgomery*'s holding—that *Miller* applies retroactively on collateral review—remains intact, *id.* at 118. And, the majority

pointed out, *Montgomery* had "unequivocally stated that '*Miller* did not impose a formal factfinding requirement' and added that 'a finding of fact regarding a child's incorrigibility . . . is not required.'" *Id.* at 104–05 (quoting *Montgomery*, 577 U.S. at 211).

¶100  As for *Montgomery*'s assertion that *Miller* barred JLWOP "for all but the rarest of juvenile offenders . . . whose crimes reflect permanent incorrigibility," *Montgomery*, 577 U.S. at 209, the *Jones* majority characterized *Miller* as merely acknowledging "that a discretionary sentencing procedure would help make life-without-parole sentences relatively rare," as borne out by statistics from those states with discretionary JLWOP, *Jones*, 593 U.S. at 112. According to the majority, *Miller* required only that "a sentencer must have discretion to consider youth before imposing a [JLWOP] sentence," and "*Montgomery* did not purport to add to *Miller*'s requirements." *Id.* at 109.

¶101  Despite the Court's insistence that *Jones* did not overrule *Montgomery*, the two cases are difficult to reconcile. While *Montgomery* read *Miller* as imposing a substantive rule that rendered JLWOP unconstitutional for all but the rare juvenile offender "whose crimes reflect irreparable corruption," *Montgomery*, 577 U.S. at 209, *Jones* held that *Miller* "mandated only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a [JLWOP] sentence," *Jones*, 593 U.S. at 101 (cleaned up).

¶102 As we see it, the substantive rule recognized in *Montgomery* did not survive *Jones*'s subsequent holding that permanent incorrigibility is not "an eligibility criterion" for JLWOP and that "a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient." *Jones*, 593 U.S. at 105, 107–09. And we are bound to follow the Supreme Court's most recent pronouncement in *Jones*. *Cf. In re Adoption of J.S.*, 2014 UT 51, ¶ 49, 358 P.3d 1009 (explaining that where "two lines of cases are unquestionably incompatible . . . our most recent pronouncement is the law, and has overtaken any prior contrary statement").

¶103 Although *Jones* expressly declined to overrule the holdings in *Miller* and *Montgomery*, it described those untouched holdings narrowly: "*Miller* held that a State may not impose a mandatory life-without-parole sentence on a murderer under 18. Today's decision does not disturb that holding. *Montgomery* later held that *Miller* applies retroactively on collateral review. Today's

decision likewise does not disturb that holding." *Jones*, 593 U.S. at 118. So when *Jones* says it is not overruling the holding in *Montgomery*, we read that as leaving intact *Montgomery*'s ultimate holding that *Miller* is retroactive—that is, a defendant sentenced to mandatory JLWOP prior to *Miller* is entitled to resentencing under a discretionary sentencing scheme—not its assertion that it is unconstitutional to impose a JLWOP sentence on a juvenile who is not permanently incorrigible.[159]

¶104 This interpretation of *Jones* is where we part ways with the majority. The majority recognizes that, under *Jones*, "[a] sentencing court has no obligation to make an on-the-record finding of permanent incorrigibility before imposing a JLWOP sentence," but holds that "a contrary finding bars the court from imposing JLWOP." *Supra* ¶ 74. The majority reasons that the presumption of regularity makes the difference here. *Supra* ¶¶ 75–76. In the face of a silent record, the majority would presume that a judge operating under a discretionary sentencing scheme had imposed JLWOP because the judge believed that the defendant was permanently incorrigible. *See supra* ¶ 75. But "affirmative statements finding that a juvenile can change or that their crime was the result of mere transient immaturity are enough to overcome the presumption" because "the judge's own words conflict with a finding of permanent incorrigibility." *Supra* ¶ 76.

¶105 The majority's reasoning assumes that a JLWOP sentence is constitutional only if the juvenile is, in fact, permanently incorrigible. In other words, it assumes that the sentencing judge is required to find permanent incorrigibility and *Jones* merely holds that the court has no duty to make that finding on the record. But we do not read *Jones* so narrowly.

¶106 In our view, *Jones* does not merely hold that no express factual finding or on-the-record explanation is required; it holds

---

[159] To be sure, *Jones* creates confusion by quoting a "key paragraph" from *Montgomery*, stating that the absence of "a formal factfinding requirement does not leave States free to sentence a child whose crime reflects transient immaturity to life without parole. To the contrary, *Miller* established that this punishment is disproportionate under the Eighth Amendment." *Jones v. Mississippi*, 593 U.S. 98, 106 n.2 (2021) (quoting *Montgomery v. Louisiana*, 577 U.S. 190, 211 (2016)). But the quoted language cannot be squared with the express holding in *Jones* that permanent incorrigibility is not "an eligibility criterion." *Id.* at 107–08.

that no finding of permanent incorrigibility is required at all. *Jones* squarely rejects the idea that permanent incorrigibility in JLWOP cases is "an eligibility criterion akin to sanity or a lack of intellectual disability" in death penalty cases. 593 U.S. at 107. Instead, it explains that the defendant's youth is a "mitigating factor" that can be weighed differently by different judges "given the mix of all the facts and circumstances in a specific case." *Id.* at 109, 115. Not only does it reject a formal factfinding requirement, *id.* at 106, but it also rejects the idea that permanent incorrigibility is "a factual prerequisite" to imposing a JLWOP sentence, *id.* at 109 n.3 ("If permanent incorrigibility were a factual prerequisite to a life-without-parole sentence, this Court's Sixth Amendment precedents might require that a jury, not a judge, make such a finding.").

¶107  We cannot square the majority's holding in this case with *Jones*'s clear pronouncement that permanent incorrigibility is not an eligibility criterion for JLWOP. The rule that the majority adopts—that JLWOP is not permitted where the sentencing court has found the juvenile redeemable—is merely the flip side of the rule *Jones* expressly rejects—that JLWOP sentences are permitted only where a court has found the juvenile irredeemable. If permanent incorrigibility is not an eligibility criterion or factual prerequisite, there is no reason why a contrary finding would preclude a JLWOP sentence.

¶108 We acknowledge that the majority's holding finds support in decisions from two other state supreme courts, but we likewise disagree with the way those decisions treat permanent incorrigibility as an eligibility criterion in the wake of *Jones*. Those cases similarly vacated JLWOP sentences where the record suggested that the sentencing court did not believe the defendant to be permanently incorrigible. Specifically, the North Carolina Supreme Court vacated a JLWOP sentence where the sentencing court made an express finding that the juvenile was "neither incorrigible nor irredeemable." *State v. Kelliher*, 873 S.E.2d 366, 380 (N.C. 2022) (cleaned up). And Maryland's high court vacated a JLWOP sentence where it was unclear whether the sentencing judge viewed the defendant as "the rare juvenile offender whose crime reflects irreparable corruption." *Malvo v. State*, 281 A.3d 758, 772 (Md. 2022) (cleaned up).[160]

_____

[160] When *Malvo v. State* was decided on August 6, 2022, the state's highest court was called the Court of Appeals of Maryland.

(continued . . .)

¶109  Both opinions were 4–3 decisions in which the courts split over the proper interpretation of the Supreme Court's JLWOP caselaw. The majority opinions read those cases to mean that the Eighth Amendment categorically prohibits imposing a JLWOP sentence on a juvenile who is not incorrigible. *See Kelliher*, 873 S.E.2d at 380; *Malvo*, 281 A.3d at 765. But the dissenting opinions pointed out that "the most recent iteration of that line of cases, [the *Jones* opinion], unequivocally holds that *all* that is procedurally required prior to [imposing a JLWOP sentence] is an individualized sentencing proceeding in which the court has discretion to sentence the offender to less than life without the possibility of parole." *Malvo*, 281 A.3d at 806 (Hotten, J., dissenting); *see also Kelliher*, 873 S.E.2d at 401 (Newby, C.J., dissenting) (explaining that, under *Jones*, "a sentence is constitutionally permissible so long as the trial court is permitted to consider the juvenile defendant's age and attendant characteristics"). Under the dissenting justices' reading of *Jones*, whether JLWOP "is constitutionally sufficient under the Eighth Amendment depends upon the presence [of a] discretionary sentencing procedure. It is decisively *not*, as the majority holds, whether the sentencing court, at least implicitly, found the juvenile to be incorrigible." *Malvo*, 281 A.3d at 809 (Hotten, J., dissenting) (cleaned up); *see also Kelliher*, 873 S.E.2d at 401 (Newby, C.J., dissenting) (asserting that "a trial court need not determine that a juvenile defendant is incorrigible or irredeemable before using its discretion to sentence the defendant to life imprisonment without the possibility of parole").

¶110  "Other courts have understood *Jones* similarly and have concluded that no viable *Miller* claim exists, so long as the sentence is not mandatory—that is so long as the sentencer has discretion to consider the mitigating qualities of youth and impose a lesser punishment." *People v. Wilson*, 220 N.E.3d 1068, 1077 (Ill. 2023) (cleaned up) (citing cases); *see also Fletcher v. State*, 532 P.3d 286, 305 (Alaska Ct. App. 2023) (holding that *Jones* forecloses any federal constitutional claim under *Miller* so long as the defendant was sentenced under a discretionary sentencing scheme). Those courts agree that "under the current state of Eighth Amendment law as

---

*See Malvo v. State*, 281 A.3d 758 (Md. 2022); *see also* MD. CONST. art. IV, pt. I, § 1 (1867). Effective December 14, 2022, the court was renamed the Maryland Supreme Court. *See* MD. CONST. art. IV, pt. I, § 1; *see also* S.B. 666, 2021 Gen. Assemb., Reg. Sess. (Md. 2021); H.B. 885, 2021 Gen. Assemb., Reg. Sess. (Md. 2021).

expressed by *Jones*, 'a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient.'" *Commonwealth v. Felder*, 269 A.3d 1232, 1243 (Pa. 2022) (quoting *Jones*, 593 U.S. at 105).

¶111 Indeed, some courts that had interpreted *Miller* and *Montgomery* to restrict JLWOP sentences to permanently incorrigible youth have now overruled those opinions in light of *Jones*. For example, the Illinois Supreme Court overruled its prior holding "that a juvenile offender's discretionary life sentence does not comport with the [E]ighth [A]mendment unless the sentencing court first makes a finding of permanent incorrigibility" because that holding "is *directly* at odds with the holding in *Jones*—specifically, that additional findings are not required, in that a discretionary sentencing scheme that allows a court to consider youth and its attendant characteristics is constitutionally sufficient." *Wilson*, 220 N.E.3d at, 1076–77 (cleaned up) (overruling *People v. Holman*, 91 N.E.3d 849 (Ill. 2017)). The Supreme Court of Pennsylvania also overruled its prior decision that had interpreted *Montgomery* to "permit the imposition of a life-without-parole sentence upon a juvenile offender only if the crime committed is indicative of the offender's permanent incorrigibility" because that understanding "has been abrogated by the High Court's decision in *Jones*." *Felder*, 269 A.3d at 1243 (cleaned up) (overruling *Commonwealth v. Batts*, 163 A.3d 410 (Pa. 2017)).

¶112 We read *Jones* similarly. Because permanent incorrigibility is not an eligibility criterion, a JLWOP sentence is not categorically unconstitutional when imposed on a juvenile who the court views as redeemable. *Jones* also disavowed the notion that a sentencer must weigh a juvenile's youth and attendant characteristics in any particular way. *Jones*, 593 U.S. at 115. Instead, all that the Eighth Amendment requires is that the sentencer have discretion to consider youth as a mitigating factor. *Id.*

¶113 In this case, Mullins received the individualized sentencing that the Eighth Amendment requires. *See State v. Houston*, 2015 UT 40, ¶ 61, 353 P.3d 55 (concluding that Utah's discretionary JLWOP sentencing scheme comported with *Miller*). The sentencing court had discretion to impose a lesser sentence if it determined that a JLWOP sentence was not appropriate. *See* UTAH CODE § 76-3-207(4)(c)–(d) (2001). Among other things, the court could consider evidence regarding "the defendant's character, background, history, mental and physical condition" and "any other facts in aggravation or mitigation of the penalty that the court

consider[ed] relevant to the sentence." *Id.* § 76-3-207(2)(a)(ii), (iv) (2001). In particular, the governing statute's non-exclusive list of mitigating circumstances included "the youth of the defendant at the time of the crime." *Id.* § 76-3-207(3)(e) (2001).

¶114   There is no need for us to decipher the sentencing court's remark about "a chance to change." Even if the sentencing court believed that Mullins had the capacity to change, it would not render Mullins's sentence unconstitutional. The sentencing court had discretion to impose a lesser sentence based on an individualized assessment of all relevant circumstances, including Mullins's youth. Mullins's capacity to change was simply one mitigating factor that the court had discretion to weigh, along with all other factors, in determining whether JLWOP was appropriate. Because the Supreme Court has held that "a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient," *Jones*, 593 U.S. at 105, we would affirm Mullins's sentence.

———————